UNITED STATES of America

v.

Candido ARENAS, Jr., Defendant.

No. 98 Cr. 496(DC).

United States District Court,
S.D. New York.

April 8, 1999.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, by Mark F. Mendelsohn, for U.S.

Ian J. Yankwitt, The Legal Aid Society, New York City, for defendant Candido Arenas, Jr.

### OPINION

CHIN, District Judge.

On May 28, 1997, defendant Candido Arenas, Jr. was walking with his brother and a friend in lower Manhattan. The three men caught the attention of four New York City police officers, who proceeded to monitor their movements for approximately an hour-and-a-half. Eventually, the three men began walking toward the City Hall subway station, when the officers stopped them. The officers frisked the men incident to the stop, and discovered a firearm in Arenas's jacket pocket and a clip of ammunition in his right front pants pocket. Later, the officers also found two resident alien cards in Arenas's possession one bearing his name and one blank.

Arenas was arrested and charged with possession of a firearm by an illegal alien in violation of 18 U.S.C. § 922(g) and possession of fraudulent immigration documents in violation of 18 U.S.C. § 1546(a). Arenas moves to suppress the firearm, ammunition, and resident alien cards seized from him as well as certain statements made by him following his arrest.

After considering the evidence and testimony presented at an evidentiary hearing conducted on January 14 and 19, 1999, I hold that the evidence was obtained as a result of an unconstitutional *Terry* stop and that the evidence must therefore be suppressed. The following constitute my findings of fact and conclusions of law.

### FINDINGS OF FACT

On May 28, 1997, a weekday, four plain clothes New York City police officers were on patrol in downtown Manhattan. The officers were members of the First Precinct's Anti–Crime Unit, and they had been assigned to look for and respond to any suspicious or criminal activity. Officers Dean Pecorale and Joseph Cosaluzzo were in an undercover taxicab, while Officer James Davis and Sergeant Pete Quinn were patrolling in an unmarked black Oldsmobile. The officers communicated with each other by radio.

At approximately 4:15 p.m., in the vicinity of Canal and Church Streets, Davis's attention was drawn to three Hispanic men. They caught his eye, in part, because of the way they were dressed. Two were dressed as if they were tourists from Texas; one wore a cowboy hat and black leather vest and the other a suede blazer. The third person, later identified as defendant Candido Arenas, Jr.,[1] was wearing a black leather jacket and jeans.

---

**1.** Arenas is 20 years old. He came to the

United States illegally from Mexico approxi-

Davis thought the three men looked suspicious. Although two were dressed like tourists and one was not, they were together and talking to each other. They were looking around, as if they were in "awe," in what Davis thought was almost an exaggerated manner. There had been a recent "rash" of pickpocketing and "bag boosting" incidents and grand larcenies in the area, and Davis suspected that the three men might be up to mischief. He decided that the three men should be followed.

The three men headed south on Church Street. Davis and Cosaluzzo followed on foot. Pecorale and Quinn followed in the vehicles, but because traffic on Church Street runs northbound, they had to circle the blocks repeatedly to keep up with the three men as they traveled south. The officers stayed in contact with each other by radio, although they did not speak to each other continuously.

The three men walked at a slow pace. Two of the three often walked ahead while the third, usually Arenas, lagged behind, sometimes by as much as 20 feet. They stopped in front of a number of stores. Two of the men would look into the store while the third would look into the street or behind them as if to see whether they were being followed. Pecorale believed this conduct was suspicious.

At Chambers Street, the three men turned left and walked east to Broadway, where they turned right and continued south on Broadway. They continued their pattern of walking slowly, separating as one lagged behind, and stopping in front of stores. The officers continued to follow.

At the corner of Broadway and Liberty Street, the three men entered a cellular phone store. The two officers who had been in the vehicles left their vehicles, and all four officers watched the store from different vantage points on foot. They could see that Arenas remained near the front of the store, just inside the entrance, while the other two men walked to the rear of the store.

After approximately 10 or 15 minutes, Arenas moved to the back of the store. Quinn thought that Arenas had made eye contact with him and identified him as a police officer. All three individuals then left the store, walking at a quicker pace. The three proceeded north on Broadway, walking at a faster pace than they had been walking before they entered the cellular phone store. The four officers followed, on foot.

As the three men reached the southern end of City Hall Park, Pecorale saw Arenas reach into the left, inside breast pocket of his jacket, pull something out, and place it into his outside right jacket pocket. Pecorale did not relay what he saw to the other officers, and there was no discussion among the officers of the possibility that Arenas was armed. Pecorale could not tell what the object was, but it was a dark object approximately the size of Arenas's hand. A few moments later, Arenas removed the jacket, holding it in his right hand.

The three men continued to walk along the southeast side of City Hall Park. The officers then decided to stop the three men, for the officers were concerned that the men would disappear into the subway system. It is unclear who made the decision to stop the three men. There was no discussion among the officers; one of the officers simply said, in substance, "let's stop these guys." Pecorale had no opinion as to whether the decision to stop them was correct, nor did he have a belief as to whether the three men had committed or were committing a crime. Davis agreed with the decision, but he also did not have a belief as to whether the three men had committed or were committing a crime. He suspected, however, that the three men

mately six years ago, and has worked in restaurants since the age of 15. He has worked at his current place of employment for almost five years, working his way up from dishwasher, to busboy, to waiter. There is no indication that he has a prior criminal record.

were either a pickpocket team or that they had been "casing" the cellular telephone store.[2]

The officers displayed their shields, identified themselves as police officers, and told the three men to stop. The three men did so. At that point, Arenas dropped his jacket to the ground. Davis picked the jacket up. As he grabbed it, he felt something hard and realized immediately that it was a gun. He advised his partners, and the officers placed the three men under arrest.

Inside Arenas's jacket pocket was a .380 mm automatic firearm. Arenas was also carrying in his right front pants pocket a clip for the weapon containing some rounds of ammunition. Arenas also had in his possession two resident alien cards, one in his name and one that was blank. Arenas testified that as he was walking around on the day in question, he was nervous because he knew that he was an illegal alien, that he was carrying an illegal weapon, and that he would be in "big trouble" if he were caught. He also testified that he started becoming nervous at the cellular telephone store because he knew there were a lot of police in the area.

The charges against the other two men, Arenas's brother, Martin Arenas, and friend, Gabriel Moran, were dropped. The instant indictment was filed against Arenas. This motion followed.

## DISCUSSION AND CONCLUSIONS OF LAW

### A. *The Parties' Contentions*

Arenas moves to suppress the firearm, ammunition, and resident alien cards seized at the time of his arrest and his post-arrest statements. He contends that the officers lacked reasonable suspicion to stop him, and that the firearm, ammunition, and resident alien cards discovered in his jacket pocket were therefore illegally

seized. Accordingly, Arenas argues, these items should be suppressed as fruits of an illegal *Terry* stop. Arenas further contends that, because the illegally seized items could not properly have given the officers probable cause to arrest him, his post-arrest statements should also be suppressed.

The Government makes two arguments in opposition to Arenas's motion to suppress. First, while conceding that Arenas was the subject of an investigative stop, the Government argues that the stop was supported by reasonable suspicion, and that Arenas was therefore properly stopped and the items in his pocket lawfully seized. The Government argues further that, because these items gave the officers probable cause to arrest Arenas, his subsequent arrest and post-arrest statements were also properly obtained. Alternatively, the Government argues that Arenas abandoned his jacket and therefore the item discovered therein—the firearm—was properly seized as abandoned property.

Accordingly, two issues are presented: (1) whether the officers had reasonable suspicion to subject Arenas to an investigative stop, and (2) whether Arenas abandoned his jacket prior to the stop, thereby relinquishing any expectation of privacy he may have had in the property contained in his jacket pocket.

### B. *Reasonable Suspicion*

#### 1. *Applicable Legal Standards*

The Fourth Amendment prohibits unreasonable searches and seizures. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *see also United States v. Blue*, 78 F.3d 56, 59 (2d Cir.1996). In determining the reasonableness of a search, a court balances the intrusion on an individual's privacy interest against the

---

**2.** Although there were four officers involved in the surveillance, only two—officers Peco-

rale and Davis—testified at the hearing.

government's interest in conducting the search. *See Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). While a search generally may not be conducted without a warrant issued upon a showing of probable cause, exceptions to these requirements exist under certain circumstances. *Id.*

■ The case of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), created one such exception to the probable cause requirement, "an exception whose 'narrow scope' [the Supreme Court] 'has been careful to maintain.'" *Ybarra v. Illinois,* 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (quoting *Dunaway v. New York,* 442 U.S. 200, 210, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). Under *Terry* and its progeny, an investigating officer may briefly detain an individual for questioning so long as the officer has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). Such a limited stop does not offend the Constitution, even though probable cause for an arrest may be lacking. *See Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581.

■ While the standard for what constitutes reasonable suspicion is "rather lenient," *United States v. Buenaventura–Ariza,* 615 F.2d 29, 32 (2d Cir.1980) (quoting *United States v. Price,* 599 F.2d 494, 501 (2d Cir.1979)), reasonable suspicion nevertheless requires that the officers be aware of "specific articulable facts" that, together with rational inferences from those facts, "reasonably warrant suspicion" that the individual was engaging in or was about to become engaged in criminal activity. *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Indeed, the Fourth Amendment requires "some minimal level of objective justification" for making the stop. *INS v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). A mere "inchoate and unparticularized suspicion or

'hunch'" will not suffice. *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

■ "[I]n making [the] assessment [whether there is reasonable suspicion,] it is imperative that the facts be judged against an objective standard." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. That is, it must be determined whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 22, 88 S.Ct. 1868 (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Finally, in evaluating the validity of a *Terry* stop, a court must consider "the totality of the circumstances." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

■ Once an officer has reasonable suspicion to conduct an investigative stop, the officer may then frisk the individual stopped for weapons if the officer reasonably believes that person to be armed and presently dangerous. *See Terry,* 392 U.S. at 24, 88 S.Ct. 1868; *see also Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Thus, the determination of whether a search or seizure is unreasonable under the Fourth Amendment involves a two-part inquiry: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868.

### 2. *Terry*

*Terry* is particularly instructive, not only because it is the seminal decision in the area of investigative stops, but also because the facts of this case are remarkably similar, in some respects, to the factual circumstances at issue in *Terry.*

In *Terry,* a police officer observed two men on a street corner take turns pacing

up and down the street, passing several store fronts, and pausing once in each direction to look into a store window. The two men repeated the same series of motions approximately 24 times over a period of 10 to 12 minutes, looking in the same store window each time, and stopping briefly to confer with each other in between trips. 392 U.S. at 6, 22–23, 88 S.Ct. 1868. During one of these conferences, the two men were joined by a third man, who spoke with them briefly and then walked quickly down the street, away from the other two. Eventually, after continuing this routine for several minutes more, the two men also walked off down the street, following the path taken earlier by the third man. *Id.* at 6, 23, 88 S.Ct. 1868. This unusual conduct aroused the officer's suspicions, and after it became clear to him that the men were not waiting for anyone or anything in particular, the officer approached them, identified himself as a police officer, and patted them down to search for concealed weapons. *Id.* at 6–7, 23, 88 S.Ct. 1868. The officer discovered that two of the three men were in possession of firearms. *Id.* at 7, 88 S.Ct. 1868.

The defendants in *Terry* moved to suppress the guns on the ground that the evidence was obtained without probable cause to arrest them. In addressing whether the officer's actions exceeded the bounds of permissible conduct under the Fourth Amendment, the Supreme Court specifically approved the practice of police officers approaching people "in appropriate circumstances and in an appropriate manner" for purposes of investigating possibly criminal behavior even in situations where there was no probable cause to make an arrest. *Id.* at 22, 88 S.Ct. 1868. Indeed, the Court reasoned that such investigative stops serve an essential governmental interest by enabling beat officers to take "swift action predicated upon ... on-the-spot observations," thereby furthering the efforts of police officers to effectively detect and prevent crime. *Id.* at 20, 22, 88 S.Ct. 1868. Guided by these underlying principles, the Court ultimately concluded that the stop of the defendants was reasonable given the particular circumstances of that case, stating that, in light of the officer's extensive experience in "the detection of thievery" from stores in that particular neighborhood, it would have been "poor police work" for him to have failed to investigate the matter further. *Id.* at 23, 88 S.Ct. 1868.

Thus, the Supreme Court made clear in *Terry* that the Fourth Amendment will tolerate minimal intrusions into individuals' privacy absent a showing of probable cause, so long as the actions of the police officer performing the investigative stop are objectively reasonable in light of the particular circumstances of the case. The Court in *Terry* specifically noted, however, that each case must be decided on its own facts, *id.* at 30, 88 S.Ct. 1868, and, indeed, when the policies and interests justifying the type of intrusion legitimized by *Terry* are not furthered, the stop cannot be condoned.

### 3. *Analysis*

■ Comparing the circumstances present in this case to those present in *Terry*, I conclude that the officers here did not have a reasonable suspicion, supported by articulable facts, that Arenas was engaging in or was about to engage in criminal activity when he was stopped. The Government argues that the following observations gave the officers reasonable suspicion to conduct an investigative stop: (1) Arenas and his companions were dressed in unusual attire and appeared to be acting as if they were tourists; (2) the three men walked at a slow pace, with Arenas often lagging behind the other two by as much as 20 feet; (3) the three men stopped in front of a number of stores, and two of the men would look into the store while the third would look into the street or behind the other two; (4) when the men entered a cellular phone store, Arenas remained near the front of the store, just inside the entrance, while the other two men walked

to the rear of the store; (5) when Quinn thought that Arenas had made eye contact with him, the three men left the store and began walking up the street at a quicker pace than before; and (6) Pecorale observed Arenas reaching into the left, inside breast pocket of his jacket, pulling out a dark object approximately the size of Arenas's hand, and placing it into his right outside jacket pocket. Based on these observations, the Government argues that the officers' suspicions of criminal activity were objectively reasonable under the circumstances. I disagree, for the following reasons.

First, from an objective viewpoint, the above conduct engaged in by Arenas and his companions was perfectly innocent. Whether viewed individually or collectively, virtually every one of the above actions constituted innocent behavior.[3] Indeed, the conduct of Arenas and his companions—strolling down a New York City street on a busy weekday afternoon, pausing every now and then to window shop or enter a store, and eventually walking to the subway to go home—was no different from the kind of conduct engaged in by thousands of people in this city every day, and indeed fell far short of the suspicious conduct at issue in *Terry*. Moreover, this conduct was seemingly inconsistent with any intent to break the law. If the three men had actually wanted to rob a store, for example, they probably would not have

chosen a cellular telephone store on Broadway in lower Manhattan at the end of a work day. Likewise, if they were intending to engage in pickpocketing or bagboosting, they probably would not have acted or dressed in a manner that was bound to draw attention to themselves.

Second, the officers' testimony indicates that they did not actually believe that Arenas and his companions were committing or were poised to commit a crime at the time the stop was actually made. Although the standard for reasonable suspicion is an objective one, the officers' subjective beliefs nevertheless are helpful in deciding what was objectively reasonable.

While Pecorale and Davis offered some testimony to the effect that they believed that Arenas and his companions might have been "casing" the cellular telephone store, the officers did not stop Arenas and his companions while they were in the store or even just after they left the store. Rather, the officers waited to see whether anything further would develop. But no further indication of criminal activity ever did materialize, as evidenced by Pecorale's and Davis's testimony concerning their impressions of the events surrounding the stop. This testimony amply demonstrates that the officers did not have any objective basis upon which to stop Arenas and his companions at the time the stop was actually performed. Indeed, when asked to

3. Pecorale's contention that he saw Arenas move a small, dark object from one pocket of his jacket to another as Arenas and his companions reached the southern entrance to City Hall Park, while arguably suspicious, does not justify the stop. Pecorale testified that he "wasn't sure what [the object] was," that "it could have been anything," but that he "wasn't going to take a chance," and that "[a]s far as [he was] concerned at that point, ... [he was] acting as if it's a weapon." (Tr. at 29).

For the most part, the Court found the two officers to be credible. Indeed, Pecorale and Davis were candid in their testimony. On this point, however, the Court is not persuaded that Pecorale actually believed that Arenas was carrying a gun. Pecorale never communicated this suspicion to his fellow officers,

even though the officers had been in radio contact with each other throughout their surveillance of the three men, and it is simply not plausible that Pecorale would not have immediately informed his fellow officers if he had actually believed that Arenas was armed. Moreover, Pecorale later conceded on cross examination that, at the time he saw Arenas handle the dark object, he could not articulate any crime that he believed Arenas had committed or was about to commit. (*See* Pecorale testimony, tr. at 51: "At that time, I don't know if I believed he was going to commit any crime.... I couldn't say he definitely committed [a crime], if that's what you are asking, no."). Accordingly, the Court finds that Pecorale did not actually believe that he saw a gun.

state their reasons for stopping Arenas and his companions, neither of the officers who testified was able to articulate a reason for doing so.

For example, when pressed about what was going through his mind closer to the time of the actual stop, Pecorale testified that he had no opinion as to whether the decision to stop the men was correct and that he had no belief as to whether the three men had committed or were committing a crime. (Tr. at 69–70). Similarly, while Davis testified that he agreed with the decision to stop the men, he also testified that he had no belief as to whether the men had committed or were about to commit a crime at the time the decision was made to stop them. (Tr. at 109). Neither Pecorale nor Davis was able to identify which of the officers actually made the decision to initiate the stop. Both testifying officers conceded that there was no discussion among the officers as a group as to whether a stop was warranted. According to Davis one of the officers simply said, in substance, "let's stop these guys." (Tr. at 110).

The evidence and the testimony show that, in the end, the officers decided to stop Arenas and his companions, not because the officers believed the men to be committing a crime, but rather because they feared that the men would disappear into the subway system. Davis's testimony in particular demonstrates that the only justification the officers had for stopping Arenas and his companions at that particular moment was the officers' concern that these three men whom they had been following for the last hour-and-a-half would disappear into the subway system. (*See* Davis testimony, tr. at 106: "I figured, you know, if we are going to talk to them at any time, this is the best time right now, otherwise we will never know.").

Finally, whatever reasonable suspicion that the officers might have had at one point during their surveillance dissipated by the time the stop actually occurred. Once Arenas and his companions left the cellular phone store, the officers no longer had any reason to be suspicious of the men's behavior, for, at that time, it was clear that Arenas and his companions were heading toward the subway—away from the stores on Park Row and Broadway aid thus away from any establishment in which the men might perpetrate a robbery. Moreover, the absence of any actual criminal conduct by Arenas and his companions after one-and-a-half hours of surveillance dispelled any suggestion of criminal activity on their part.

In *Terry*, the Supreme Court specifically noted that the actions of the defendant and his companion were "consistent with [the officer's] hypothesis that these men were contemplating a daylight robbery" and that "nothing in their conduct from the time he first noticed them until the time he confronted them and identified himself as a police officer gave him sufficient reason to negate that hypothesis." 392 U.S. at 28, 88 S.Ct. 1868. In contrast, the actions of Arenas and his companions over the course of an hour-and-a-half "negate[d]" the police officers' hypothesis that the three men were seeking to break the law. While the officers should be commended for not rushing to judgment or acting hastily, by the time Arenas and his brother and friend reached City Hall Park, it was no longer objectively reasonable for the officers to suspect that criminal activity was afoot, and the officers should have simply let the men go.

Hence, unlike in *Terry*, it was not reasonable for the officers to stop Arenas at the moment they did, for whatever sense of urgency that might have existed earlier and that might have justified an investigative stop had disappeared by the time the officers actually performed the stop. The risk that Arenas and his fellow travelers might have disappeared into the subway before the officers had a chance to confirm their suspicions of criminal activity does not provide the officers with sufficient justification for performing the stop without reasonable suspicion.

In sum, considering the totality of the circumstances, the Court is convinced that Arenas and his companions were not "casing" the cellular phone store or preparing to commit some other crime, and the officer's suspicions to the contrary were not supported by the objective facts. Based on the testimony given by Pecorale and Davis at the hearing, it is clear that, throughout their surveillance and, in particular, at the time of the stop, the officers had nothing more than an "unparticularized suspicion" and a "hunch" that Arenas and his companions were committing or were about to commit a crime. *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). Indeed, Davis essentially conceded that the only reason the officers decided to stop the three men was to prevent them from disappearing into the subway before the officers were able to confirm their vague suspicions of criminal activity. In short, the circumstances here simply did not amount to the "minimal level of objective justification" necessary to subject Arenas to a *Terry* stop. *Delgado,* 466 U.S. at 217, 104 S.Ct. 1758.

Because the officers' stop of Arenas was not supported by reasonable suspicion, I hold that the stop violated the Fourth Amendment. Accordingly, all items seized from Arenas subsequent to the stop—including the firearm, ammunition, and resident alien cards—must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see also United States v. Knoll,* 16 F.3d 1313, 1321 (2d Cir.), *cert. denied,* 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 490 (1994).

### C. *Abandonment*

As a back-up argument, the Government contends that the firearm was legally obtained because it was found in the pocket of a jacket that Arenas abandoned, and therefore the officers had the right to seize any property that was contained therein.

■ It is well-settled that when an individual voluntarily abandons his property, "he forfeits any reasonable expectation of privacy that he might have had in the property." *United States v. Lee,* 916 F.2d 814, 818 (2d Cir.1990). Accordingly, "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property." *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). When property is alleged to have been abandoned incident to a search and seizure of the individual by the police, however, the precise moment at which the individual relinquishes the property is critical. Indeed, where it is determined that the alleged relinquishment of the property at issue occurred after an illegal search or seizure of the person, the individual's actions in response to the illegal search or seizure cannot be deemed to be an abandonment of the illegally obtained property so as to purge the taint from the unlawful police conduct. *See United States v. Wilson,* 953 F.2d 116, 127 (4th Cir.1991); *United States v. Clark,* 822 F.Supp. 990, 1012–13 (W.D.N.Y.1993); *cf. California v. Hodari D.,* 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (holding that where defendant abandoned drugs in his possession prior to being seized or arrested drugs could not be suppressed as fruit of an illegal seizure).

■ In the instant case, I find that Arenas abandoned the jacket, if at all, after he was stopped by the officers. While Pecorale testified that he was not certain whether Arenas dropped the jacket just before or just after the officers ordered the men to stop (*see* tr. at 31–32, 73), Davis's testimony makes clear that Arenas did not drop his jacket until after the officers had identified themselves as police officers and told the three men to stop. (*See* Davis testimony, tr. at 101: "Well, I approached him, you know, I had my shield out. I said police. I just want to talk to you for a second. At that point, he dropped his jacket."). As Arena's action in dropping the jacket was the direct re-

sult of the illegal stop, Arenas cannot be deemed to have abandoned the jacket, and, accordingly, the firearm must be suppressed as the fruit of an illegal *Terry* stop.

## CONCLUSION

For the foregoing reasons, Arenas's motion to suppress the firearm, ammunition, and resident alien cards is granted.

SO ORDERED.