07-5359-cr
United States v. Padilla

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

_____

August Term 2008

(Argued: September 26, 2008      Decided: December 2, 2008)

Docket No. 07-5359-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

HECTOR PADILLA,

Defendant-Appellant.

_____

On Appeal From the United States District Court
For the Eastern District of New York

_____

B e f o r e :  RAGGI and CALABRESI, Circuit Judges, and KEENAN,
District Judge.[*]

_____

Appeal from a judgment of conviction for possession of a firearm by a convicted felon.  The United States District Court for the Eastern District of New York, Nicholas G. Garaufis, J., adopting recommendations of Roanne L. Mann, United States Magistrate Judge, denied a motion to suppress after concluding that the stop and frisk of defendant by police was constitutional. Appellant challenges this ruling as well as trial rulings restricting his cross-examination of government witnesses.

AFFIRMED.

_____

[*]    The Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.

———————————————

KATHLEEN NAUGHTON, Assistant United States
Attorney (Jo Ann M. Navickas, Assistant
United States Attorney, <u>on the brief</u>), <u>for</u>
Benton J. Campbell, United States Attorney
for the Eastern District of New York, <u>for</u>
<u>Appellee</u>.

SAMUEL GREGORY, New York, N.Y., <u>for</u>
<u>Defendant-Appellant</u>.

———————————————

KEENAN, <u>District Judge</u>:

**INTRODUCTION**

Defendant-appellant Hector Padilla appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Garaufis, J.) after a jury trial for possession of a firearm as a convicted felon. Before trial, the district court concluded that police had reasonable suspicion to stop and frisk the defendant pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and denied defendant's motion to suppress the handgun that was recovered. On appeal, Padilla challenges this conclusion. He also claims that the district court abused its discretion and violated his Fifth and Sixth Amendment rights with trial rulings that he claims curtailed his cross-examination of government witnesses. We affirm for the reasons that follow.

**BACKGROUND**

## A. The Suppression Motion

### 1. Facts[1]

Around 8:15 p.m. on October 27, 2006, NYPD Detective Brendan O'Brien and his partner were sitting in an unmarked car conducting surveillance of a Staten Island apartment building that they had reason to believe was being used in the sale of narcotics. O'Brien had approximately nine years of experience in the NYPD, two-and-a-half of which were spent on narcotics detail in Staten Island. The apartment building under surveillance was located near the intersection of Boyd and Cedar streets in the neighborhood of Stapleton, an area known for its high rate of shootings and drug- and gun-related arrests. Two undercover NYPD detectives were fatally shot in this neighborhood in March 2003.

From the car, O'Brien observed a skinny, white male walking in the middle of Boyd Street toward the intersection where the apartment building is located. Based upon the man's skinny and "disheveled" appearance, and the fact that he was a white man in a

---

[1] In denying Padilla's motion to suppress, the district court adopted a report and recommendation issued by Magistrate Judge Roanne L. Mann after a suppression hearing. The sole witness at the hearing was Brendan O'Brien, a New York City Police Department ("NYPD") detective who stopped and frisked Padilla and found the handgun on him. The facts set forth in this section are from Det. O'Brien's undisputed testimony, which the magistrate judge found to be credible. Because the testimony was not disputed and was found credible, we take it as true for purposes of our opinion.

predominantly African American neighborhood, O'Brien believed that he might have been a drug user on his way to the surveilled building to buy drugs. Instead of turning left on Cedar street toward the building, however, the disheveled man continued straight on Boyd street, crossing Cedar toward a wooded pathway where Boyd ends.

At this point, Det. O'Brien noticed two other men who appeared to be following the disheveled man. One of the two who were following was the defendant, Padilla. The two men were walking together in single file and without speaking in the same direction along Boyd street, twenty feet behind the disheveled man. There was no one else around. From the manner in which the two men were walking, in single file while remaining directly behind the disheveled man, it appeared to Det. O'Brien that they were trying to avoid the man's peripheral vision so that he would be unable see them were they to approach from behind.

The two men continued across Cedar street, staying behind the disheveled man and heading toward the same wooded path. O'Brien thought it was odd that the only persons on the street at that time would all choose to walk through an unlit wooded path in that high crime area after dark, instead of using the lighted sidewalks. He believed that a crime might possibly happen inside the wooded lot— either that the two men would rob the disheveled man, or that the three would engage in a drug transaction.

4

With his suspicions aroused, O'Brien drove around the block to observe whether the three men exited the path or remained in the wooded area. It took O'Brien approximately thirty seconds to circle the block. On the other side, he saw that the two men had caught up to the disheveled man, and the three had exited the path and appeared to be walking as a group. Although O'Brien did not think that the two men already had robbed the other in that short span of time, he believed that a robbery still might occur. He testified that he

> still thought [the robbery] could possibly be taking place; that they had got up close to him now and where [the wooded path] exits there, Gray Street, I said it comes, turns to Gordon Street, there also is a very wooded lot right there also, maybe you could say desolate, [the robbery] can happen as they exit also.

O'Brien also testified that a drug deal could have happened in the thirty seconds it took the men to walk across the lot. According to O'Brien, the fact that the three men had crossed the lot and were exiting it as a group thirty seconds after entering neither increased nor decreased his suspicion about whether criminal activity was afoot.

As O'Brien was pulling up in the car, from about fifty feet away from the men, he observed Padilla reach underneath his jacket and shirt, adjust something in the center of his waistband, and continue walking. Although O'Brien could not make out the dimensions of the adjusted object, it appeared to have some weight

5

to it because of the way it shifted and the way Padilla moved his hand. From O'Brien's police experience, he recognized the movement as consistent with the adjustment of a gun lodged in one's waistband. O'Brien testified that he knew that firearms commonly are concealed in the waistband and that, when they are, they require readjustment because they shift and become uncomfortable. O'Brien previously had made eight to ten arrests where persons observed to make the same gesture turned out to be carrying guns in their waistbands. He also had become accustomed on an almost daily basis to seeing his fellow officers make the same movement to adjust concealed firearms carried by them. Although O'Brien realized at the time that Padilla could have been adjusting something other than a firearm, he did not recognize the gesture as being consistent with any innocent explanation.[2]

Still suspecting that a robbery or drug deal might take place, and now believing that one of the two followers might be

---

[2] At the suppression hearing, Det. O'Brien demonstrated the hand gesture twice for the magistrate judge. On cross-examination, the defense inquired whether Padilla might have been adjusting a cell phone or keys clipped to his belt. On re-direct, O'Brien testified that he had never seen a person wear a cell phone or keys right in the middle of the waistline. Defense counsel also asked whether Padilla might have been adjusting his genitals, but O'Brien (again on redirect) stated that he did not think so because "a person's genitals are not in the middle of their stomach area." In O'Brien's experience, he had only seen illegal items—generally guns but, on one occasion, firecrackers—tucked into the center of the waistband. O'Brien also testified that Padilla's movement was not consistent with tucking in a shirt or pulling up one's pants.

6

armed, O'Brien pulled the car in front of the three men. He and his partner got out without guns drawn and instructed the men to place their hands on the vehicle. O'Brien immediately patted down the exterior of Padilla's clothing near his waistline. Feeling a hard object shaped like a gun, O'Brien reached underneath Padilla's clothing, removed a loaded .38 caliber revolver from his waistband, and placed him under arrest.

2. The Magistrate Judge's Report and Recommendation

The magistrate judge issued a report recommending that Padilla's motion to suppress be denied. She found Det. O'Brien's testimony to be wholly credible and concluded that, under the totality of the circumstances, he had reasonable suspicion to stop and frisk Padilla pursuant to Terry v. Ohio, 392 U.S. 1 (1968).

The magistrate concluded that the following facts, taken together, established reasonable suspicion and justified Det. O'Brien in briefly detaining Padilla: (1) the fact that the area was a high-crime neighborhood with a high incidence of drug- and gun-related violence; (2) the fact that the detention occurred after dark and that, as O'Brien testified, it was odd for people to travel on the isolated, unlit path after dark rather than stay on the lighted streets; (3) the suspicious manner in which the defendant and his companion had followed the disheveled man onto the wooded pathway; and (4) the defendant's hand gesture, which O'Brien recognized from his police experience as consistent with

7

the adjustment of a gun tucked into one's waistband. With respect to the hand gesture, the magistrate judge watched two in-court demonstrations and described the gesture as a "distinctive gripping motion, as if holding and adjusting (first up and then down) something comparable in size, shape, and heft to a handgun." United States v. Padilla, No. 06 Cr. 824 (NGG), 2007 WL 1958894, at *7 (E.D.N.Y. June 29, 2007) (adopting Magistrate's Report and Recommendation, dated Mar. 2, 2007). She also specifically credited O'Brien's testimony that the gesture did not appear to conform with any innocent alternative explanation.

Finally, the magistrate judge concluded that the patdown search was justified. She found that O'Brien had reason to believe that Padilla was armed and dangerous, based on his hand gesture and the other facts suggesting that a robbery or drug transaction was about to occur.

Over defense objection, the district court adopted the magistrate's report and recommendation in its entirety and denied the suppression motion.

**B. The Trial**

Trial began on August 6, 2007 and lasted two days. In his opening statement, Padilla's counsel articulated the following defense theory: While on their way to the apartment building to buy drugs, defendant and the other two men saw the detectives

8

staking the place out from their unmarked car. In response, the three men continued to walk straight on Boyd street and entered the wooded path. The men then saw the police lights of the detectives' car as it circled the wooded lot. Knowing that the police were in pursuit, one of the two men with whom Padilla was walking dumped the gun along the path. Defense counsel told the jury that the evidence would show that the police found the gun on the wooded path and planted it on Padilla, which is why Padilla's fingerprints were not found on the gun.

The government's evidence at trial consisted of the testimony of Det. O'Brien, his partner Det. William Owens, Det. Thomas Murphy, a member of the narcotics team who arrived on the scene in time to observe the firearm being removed from Padilla's waistband, and Det. Bachia, who testified that Padilla confessed to possessing the firearm after he was arrested.

The government's first witness was O'Brien, who reiterated and expanded upon his testimony at the suppression hearing. He testified that Det. Murphy and another officer arrived on the scene as he was getting out of the police car to stop the three men. O'Brien then patted down Padilla, recovered the gun from his waistband, and placed him under arrest. Next, O'Brien radioed for an NYPD Evidence Collection Team to test the gun for fingerprints. The team responded but was unable to obtain fingerprints from the gun.

9

On cross-examination, the defense sought to inquire whether the detectives had searched the wooded path and, in fact, found the gun there instead of on Padilla's person. The government objected to this line of questioning, and the trial court sustained the objections.

Det. Murphy next took the stand. He testified that he received a radio communication from O'Brien and Owens and arrived on the scene in time to see O'Brien pull the handgun from Padilla's waistband. On cross-examination, the defense again attempted to inquire whether any of the officers searched the wooded pathway. The district court sustained the government's objections, ruling that the questions went beyond the scope of direct examination.

The next witness was Det. Owens, who testified that he was working with Det. O'Brien on the evening in question. His testimony corroborated O'Brien's explanation of how the two detectives came to stop Padilla. Like O'Brien, Owens observed the two men follow the other into the wooded lot, saw them exit it together on the other side, and observed Padilla make a movement to adjust an item, which Owens believed to be a gun, in his waistband. Owens also testified to radioing the rest of the field team, which included Det. Murphy and another officer, prior to stopping the three men. Owens frisked one of the other men and subsequently saw O'Brien hand another officer the gun that O'Brien had found on Padilla.

10

On cross-examination, the defense again turned to the topic of who, if anyone, searched the wooded pathway. The trial court sustain the prosecution's objections to each of these questions.

At a conference held at the conclusion of the first day of trial, Padilla's counsel moved for a mistrial on the grounds that he should have been permitted to ask the detectives about everything they did at the scene of the arrest, including whether they went back to search the wooded path. The court denied the mistrial motion.

After the conference, the court issued a trial memorandum stating that "[i]f defense counsel wishes to pursue a theory that the weapon at issue was planted on the Defendant . . . he is of course free to do so on his direct case," for example by calling as witnesses the other two men stopped on the night in question. The memorandum went on to state that defense counsel would continue to be permitted to "cross examine any of the Government's witnesses with proper questions regarding their role or direct observations," but that the court would "not permit any argument that is not based upon the evidence or lack of evidence in this case, whether it is in the Defendant's cross examination, direct case, or closing argument."

At a conference on the morning of the second day of trial, the government advised the court that the three detectives

11

who had testified on the previous day were present and available to be called by the defense.  Defense counsel then requested that "the Court revisit a number of [the] rulings that it made."  He sought permission to cross-examine the earlier witnesses to ask them (1) whether the detectives went back and checked the pathway with flashlights for evidence; (2) whether the firearm was found on the pathway; and (3) the substance of any background information the officers had obtained from the other two men Padilla was with at the time of his arrest.  When asked by the court who the defense wanted to put back on the stand, defense counsel replied that he wished to recall Det. O'Brien only.  The court granted the defense's request to reopen cross-examination on the three subjects identified by defense counsel.

When the trial resumed, the government called Det. Bachia, who had interviewed Padilla after his arrest.  While Padilla was in custody, the detective advised him of his Miranda rights, which Padilla acknowledged in writing by signing a waiver of rights form.  Padilla then confessed that he was on his way to buy heroin when he was stopped by the police, who recovered the firearm from his waistband.  Padilla further explained that he had stolen the firearm five or six months before the arrest.

Det. O'Brien then was recalled for reopened cross-examination.  He testified that he did not examine the pathway in the wooded lot and did not know if any other police officer did.

12

The government rested, and the parties entered stipulations on the prior felony and interstate commerce elements. The defense called no witnesses. After three and one-half hours of deliberations, the jury returned a guilty verdict.

**DISCUSSION**

**A. The Terry Stop**

There is no dispute that Padilla was seized within the meaning of the Fourth Amendment when he complied with Det. O'Brien's order to stop and place his hands on the police car. The sole issue is whether there was reasonable suspicion to justify the encounter under Terry v. Ohio, 392 U.S. 1 (1968).

We review the district court's reasonable suspicion determination de novo. Ornelas v. United States, 517 U.S. 690, 697 (1996). The factual findings underlying that determination must be accepted unless clearly erroneous. United States v. Bayless, 201 F.3d 116, 132 (2d Cir. 2000). All evidence supporting the denial of the suppression motion is viewed in a light most favorable to the government. Id.

Under Terry, a police officer may briefly detain an individual for questioning if the officer has "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991). A Terry stop is "an intermediate response allowing police to pursue a limited investigation when they lack

13

the precise level of information necessary for probable cause to arrest." United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007). Accordingly, the amount of suspicion needed to justify the encounter is less than a "fair probability" of wrongdoing, and "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989).

In reviewing reasonable suspicion determinations, we look to the totality of the circumstances to see whether the officer had a "particularized and objective basis" to suspect criminal activity. United States v. Arvizu, 534 U.S. 266, 273 (2002) (quotation marks omitted). The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry, 392 U.S. at 21. While the officer may not rely on an "inchoate and unparticularized suspicion or 'hunch,'" id. at 27, he is entitled to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006) (quoting Arvizu, 534 U.S. at 273 (alterations in original, internal quotation marks omitted)). Therefore, courts evaluate the circumstances surrounding the stop "'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" Bayless, 201 F.3d at 133 (quoting United States v. Oates, 560 F.2d 45, 61 (2d Cir. 1977)).

14

"[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Even conduct that is "as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." Villegas, 928 F.2d at 516. Terry recognized that a "series of acts, each of them perhaps innocent in itself," can when "taken together warrant[] further investigation." Terry, 392 U.S. at 22.

During a lawful stop, if the investigating officer has reason to believe that the detained individual is armed and dangerous, he may conduct a patdown search for concealed weapons. Id. at 23-27; Adams v. Williams, 407 U.S. 143, 146 (1972). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Williams, 407 U.S. at 146. Therefore, the protective search is permissible "whether or not carrying a concealed weapon violate[s] any applicable state law." Id.

Applying these principles, we find that the district court correctly determined that the officers had reasonable suspicion to stop the defendant. While conducting narcotics surveillance in a high-crime neighborhood, Det. O'Brien observed a skinny, disheveled man whose appearance suggested drug use being followed by two men down an otherwise deserted street. The two men

15

walked in single file and, without speaking to one another, remained directly behind the disheveled man at a distance of twenty feet, such that they would avoid his peripheral vision if they approached from behind. This manner of walking, which appellant himself describes as "ostensibly suspicious" (Appellant's Br. at 30), supported the detective's suspicion that the two men might have been targeting the disheveled man for a robbery.

Watching all three men walk onto an isolated, dark path at night rather than stay on the lighted sidewalks caused the detective to further suspect that criminal conduct–either a robbery or a drug deal—was about to take place. Det. O'Brien testified that it seemed unusual for persons to travel by the path in that neighborhood after dark. This assessment was based not only on his observations of the area but also on his familiarity with the neighborhood's high incidence of shootings and drug-related crimes. See Arvizu, 534 U.S. at 276 (stating that officers are entitled to assess situations in light of their experience and familiarity with a particular area and its inhabitants). The high-crime nature of the neighborhood was properly "among the relevant contextual considerations" in his assessment of the situation. Wardlow, 528 U.S. at 124. Furthermore, although it was only 8:15 p.m., the choice of the unlit route after dark was another fact that reasonably contributed to the suspicion that criminal activity was afoot. Bayless, 201 F.3d at 134 (stating that, in the presence of

16

other suspicious factors, the "sometimes innocuous factors such as the time of day . . . take on added significance").

Padilla argues that any suspicion generated by the curious procession onto the wooded path should have dispelled when the three men emerged from the other side as a group just thirty seconds later, because at that moment it was apparent that no robbery had taken place along the path. According to Padilla, the only facts that remain to justify the stop are his presence in a high-crime neighborhood, "the fact that the sun had set," and his adjustment of a concealed object in his waistband. (Appellant's Br. at 24.)  He submits that these facts are insufficient under Terry and its progeny.

This argument fails because Det. O'Brien offered a reasonable explanation why he remained suspicious even after the men emerged from the wooded path.  The detective believed that the two men might have just caught up to the disheveled man at the end of the path, and that a robbery was about to occur.  This belief was not based on an "inchoate and unparticularized suspicion or hunch," as appellant asserts, but on the detective's observation that the path exited into a desolate area near another wooded lot which was similarly well-suited for a robbery.  The fact that the crime did not happen at the exact location originally expected did not, in the circumstances of this case, significantly lessen the chances that a crime would be committed.  "[T]here was nothing to

17

indicate abandonment of an intent to commit a robbery at some point." Terry, 392 U.S. at 28.[3]

In addition, Det. O'Brien testified that the men could have engaged in a drug deal during the thirty seconds it took them to cross the path. Thus, there was no reason why the initial suspicion of drug activity should have abated. If anything, the fact that Padilla and his companion exited the wooded lot alongside the apparent drug user, after entering separately, would seem to support the hypothesis that the men had met inside to conduct a drug deal.

As he was driving toward the men, Det. O'Brien observed Padilla reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline. From his police experience—which included eight to ten arrests of armed individuals observed to make the same movement, and the regular sight of his fellow officers adjusting concealed firearms carried by them in the

---

[3]    This case is unlike United States v. Arenas, 37 F. Supp. 2d 322 (S.D.N.Y. 1999), the principal case that appellant relies upon to support his dissipation argument. There, the officers' suspicion that the three men under surveillance were "casing" a cell phone store should have dispelled when the men left the store and headed toward the subway, away from any establishment in which they might perpetrate a robbery. Id. at 329. The officers could not articulate any reason why they continued to suspect criminal activity, and their testimony demonstrated that they "decided to stop [the defendant] and his companions, not because the officers believed the men to be committing a crime, but rather because they feared that the men would disappear into the subway system." Id. In contrast, at the time of Padilla's stop, he and his companion had closed the distance on their mark, and a robbery was possible at any moment.

same fashion, Det. O'Brien recognized Padilla's gesture as consistent with the adjustment of a concealed firearm. Viewing the gesture "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," Bayless, 201 F.3d at 133 (internal quotation marks omitted), it was reasonable to infer that Padilla was carrying a gun in his waistband.

Padilla maintains that the gesture was ambiguous because the dimensions of the adjusted object could not be seen through his clothing. However, after watching two in-court demonstrations of the gesture, the magistrate judge concluded that it was "a distinctive gripping motion, as if holding and adjusting (first up and then down) something comparable in size, shape, and heft to a handgun." Padilla, 2007 WL 1958894, at *7. Padilla also contends that he could have been adjusting an innocuous item, such as a cell phone, a key ring or a belt buckle. Yet Det. O'Brien testified that the adjustment was not consistent with any of the innocent explanations proposed by defense counsel at the suppression hearing, and the magistrate credited this testimony. Even if the gesture were consistent with conceivable innocuous adjustments, its "distinctive" consistency with the adjustment of a firearm provided the detective with a reasonable basis to suspect that Padilla was armed. See Wardlow, 528 U.S. at 125 (stating that "[e]ven in Terry, the conduct justifying the stop was ambiguous and susceptible of an

19

innocent explanation").

The suspected possession of a concealed handgun was another fact contributing to the suspicion that a robbery or a drug deal was afoot. Handguns are, of course, tools of the narcotics trade, United States v. Riley, 452 F.3d 160, 167 (2d Cir. 2006), and frequently the weapon of choice in robberies. See, e.g., United States v. Whitley, 529 F.3d 150, 151 (2d Cir. 2008).

The totality of the circumstances in this case—the high-crime neighborhood, the sight of two men surreptitiously following a man whose appearance suggested drug use down an otherwise-deserted street, the choice of a dark path not commonly used at night, the apparent adjustment of a concealed firearm—provided ample basis for an investigative stop. Indeed, given the distinct possibility that an armed robbery might be about to occur, the officers would have been derelict in their duty had they failed to take action.

Moreover, because the officers had reason to believe at the inception of the stop that Padilla was armed and dangerous, they were entitled to frisk him prior to questioning. "There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." Terry, 392 U.S. at 33 (Harlan, J., concurring).

20

## B. Rulings on Cross-Examination

Defendant claims that the trial court abused its discretion and violated his rights to confront witnesses and present a defense by initially disallowing cross-examination into whether the detectives searched the wooded path and, in fact, found the gun there. The right to confront witnesses is violated when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed . . . 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)). "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Id. at 678 (internal quotation marks and emphasis omitted).

Here, the district court reconsidered its initial ruling on the morning of the second day of trial and stated that it would permit reopened cross-examination into the subjects that defense counsel wished to explore. All three detectives were available to re-take the stand. Thus, defendant was afforded the opportunity of cross-examination guaranteed by the Confrontation Clause. See United States v. Maldonado-Rivera, 922 F.2d 934, 956 (2d Cir. 1990) (finding no Confrontation Clause violation and no abuse of discretion in trial court's ruling prohibiting the defense from referring in cross-examination to cassette tapes made by FBI agents

21

during surveillance, where "the court did not adhere to this ruling" but instead "permit[ted] cross-examination on a wide variety of topics . . . including the use and reuse of [the] cassettes"). Nevertheless, Padilla opted to recall only Det. O'Brien, who testified that he did not search the path and did not know if anyone else did. Defendant thereby waived the opportunity to confront the other two detectives on these subjects.

Assuming arguendo that the initial ruling was an abuse of discretion, it was harmless. The assumed error is a misapplication of an evidentiary rule and, as discussed above, not a violation of the Confrontation Clause. Therefore, we apply the harmless error standard enunciated in Kotteakos v. United States, 328 U.S. 750, 765 (1946). See United States v. Estrada, 430 F.3d 606, 622 (2d Cir. 2005). Under this standard, the error is deemed harmless if "there is 'fair assurance' that the jury's 'judgment was not substantially swayed by the error.'" Id. (quoting United States v. Yousef, 327 F.3d 56, 121 (2d Cir. 2003)). The trial court did not, as defendant claims, impermissibly preclude him from presenting his theory of defense. See United States v. Reindeau, 947 F.2d 32, 36 (1991) (holding that such an error is not harmless). The net effect of the court's rulings was that defendant had to wait until the next day to ask the questions he wanted. In light of the overwhelming evidence of guilt, which consisted of three eyewitnesses and a full confession, we are

confident that the overnight delay did not substantially influence the verdict.

Padilla argues that the later ruling did not remedy the error because, by initially sustaining the government's objections to his questions about whether police searched the path, the court "utterly delegitimized all defense inquiries on that subject in the eyes of the jury." (Appellant's Br. at 47.) Yet Padilla himself denied the later ruling its full curative effect when he decided not to reopen cross-examination of two of the three detectives. He cannot complain now of self-inflicted harm. He also failed to request that the jury be instructed not to draw an improper inference from the court's initial ruling. In any event, any residual prejudice from that initial ruling could not have affected the verdict, given the strength of the government's case.

## CONCLUSION

We have considered all other arguments raised by appellant and find them to be without merit. For the reasons stated above, the judgment of conviction is AFFIRMED.

23