# United States Court of Appeals
## for the Second Circuit

August Term 2022
Argued: April 19, 2023
Decided: August 30, 2023

No. 22-588

UNITED STATES OF AMERICA,

*Appellee*,

v.

MICHAEL HAGOOD,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York

Before:   CALABRESI, PARK, and MENASHI, *Circuit Judges*.

Around 1:00 a.m. on October 14, 2020, New York City Police Department ("NYPD") officers drove by Defendant Michael Hagood near a New York City Housing Authority ("NYCHA") complex in the Bronx.   Hagood was wearing a fanny pack across his chest and standing next to a double-parked car.   According to the officers,

Hagood was visibly nervous when he saw them, and one officer noticed that Hagood's fanny pack appeared to contain a bulging object with a straight line on top—the same shape as a handgun. The officers stopped and frisked Hagood and found a loaded semi-automatic pistol in the fanny pack.

Hagood was arrested and charged with a violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2): possessing a firearm after having been convicted of a felony. He moved to suppress the firearm, and after a two-day hearing, the district court (Engelmayer, *J.*) denied the motion. Hagood now appeals, arguing that the stop violated his Fourth Amendment rights because the officers lacked reasonable suspicion that he was engaged in criminal activity. We disagree. The totality of circumstances in this case—including the officer's observations of the fanny pack (as informed by his experience recovering firearms from fanny packs), Hagood's unusual manner of wearing the fanny pack, his nervous appearance, and the late hour in a high-crime neighborhood—established reasonable suspicion. We thus **AFFIRM**.

Judge Calabresi dissents in a separate opinion.

_____

COLLEEN P. CASSIDY, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

MITZI S. STEINER, Assistant United States Attorney (Alison Moe, Assistant United States Attorney, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

_____

PARK, *Circuit Judge*:

Around 1:00 a.m. on October 14, 2020, New York City Police Department ("NYPD") officers drove by Defendant Michael Hagood near a New York City Housing Authority ("NYCHA") complex in the Bronx. Hagood was wearing a fanny pack across his chest and standing next to a double-parked car. According to the officers, Hagood was visibly nervous when he saw them, and one officer noticed that Hagood's fanny pack appeared to contain a bulging object with a straight line on top—the same shape as a handgun. The officers stopped and frisked Hagood and found a loaded semi-automatic pistol in the fanny pack.

Hagood was arrested and charged with a violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2): possessing a firearm after having been convicted of a felony. He moved to suppress the firearm, and after a two-day hearing, the district court (Engelmayer, *J.*) denied the motion. Hagood now appeals, arguing that the stop violated his Fourth Amendment rights because the officers lacked reasonable suspicion that he was engaged in criminal activity. We disagree. The totality of circumstances in this case—including the officer's observations of the fanny pack (as informed by his experience recovering firearms from fanny packs), Hagood's unusual manner of wearing the fanny pack, his nervous appearance, and the late hour in a high-crime neighborhood—established reasonable suspicion. We thus affirm.

3

# I. BACKGROUND

A. <u>Hagood's Arrest</u>

On October 14, 2020, NYPD officers John Migliaccio and Nicholas Rios were on patrol in the South Bronx. They drove an unmarked police car, but they were in uniform and Rios's police patch was visible through their rolled-down window. Around 1:00 a.m., they drove past 1230 Webster Avenue, a NYCHA housing project. Based on their professional experience—four years for Migliaccio and eight years for Rios—as well as information from the NYPD's field-intelligence office, they knew that this was a high-crime area with gang-related criminal activity including shootings, homicides, assaults, and robberies.

Both officers saw Hagood and two other men in front of 1230 Webster Avenue. Hagood and one of the other men were standing in the street next to an SUV double-parked in a bus lane, and the third man was inside the SUV. The headlights of the patrol car, the streetlights on Webster Avenue, and the lights from stores across the street illuminated the scene.

Migliaccio and Rios observed Hagood for about two or three seconds as they drove by. Hagood was wearing a blue sweatshirt and had a fanny pack strapped over his shoulder and across his chest. Although both officers had seen other people wear fanny packs across their chest, Migliaccio thought Hagood was wearing his fanny pack "in a manner that was not consistent with everyday wear of it." App'x at A77. Rios similarly thought that the style was unusual.

Migliaccio observed that the fanny pack was "very tight across [Hagood's] chest," "with about a quarter to a third of it under his

4

armpit." *Id.* at A79, A77. Migliaccio thought wearing the fanny pack in this way kept it "steady in one spot" so the person wearing it could more easily access its contents. *Id.* at A191. Migliaccio also thought the fanny pack "appeared heavy, like there was a weighted object inside of it." *Id.* at A79. Rios similarly observed "a bulge in the fanny pack" and thought the fanny pack "looked like it was heavy." *Id.* at A309. In addition, Migliaccio saw "an elongated, rigid, solid object within the fanny pack" that looked "like it was in a line" and "hard at the top" and appeared "to be potentially the top slide of a handgun." *Id.* at A79.

Migliaccio thought Hagood "looked really nervous when he saw us"—with a "deer-in-the-headlights" look—and "almost jumped," "shuttered a little bit," and looked "visibly agitated." *Id.* at A80, A185. Rios similarly thought that, as their vehicle approached, Hagood "had a nervous look," "[a]lmost like a deer in the headlights with a frozen look for a short period of . . . time." *Id.* at A310. Migliaccio decided to perform a *Terry* stop because, based on the circumstances and his observations, he believed that Hagood's fanny pack contained a firearm.

Two other officers—Sergeant Steven Counihan and Officer Mike Suarez—had been driving another unmarked patrol car a few car-lengths behind Migliaccio and Rios. Migliaccio notified them by radio that he intended to conduct a stop. Migliaccio turned the vehicle around, parked, and approached Hagood from the north with Rios. Counihan and Suarez also parked and approached Hagood from the south. Counihan reached Hagood first and, according to Counihan, Hagood "turned his body and bent his knees as if he was going to take flight away from" the officers. *Id.* at A213. With the

help of Migliaccio and Rios, Counihan then handcuffed Hagood "to prevent him from fleeing." *Id.* Rios removed and searched Hagood's fanny pack. Inside was a loaded Hi-Point semi-automatic 9-mm pistol, along with two packs of cigarettes and a bag of cough drops.

Hagood was arrested, and on December 3, 2020, a grand jury returned an indictment charging him with one count of violating 18 U.S.C. §§ 922(g)(1), 924(a)(2), by possessing a firearm after having been convicted of a felony.[1]

B.      Suppression Hearing

Hagood moved to suppress the firearm, and the district court held a two-day hearing. The district court received evidence, including the firearm; the fanny pack; bodycam footage from Migliaccio, Rios, and Suarez;[2] surveillance footage from a dentist's office across the street; maps and photographs of the area; and photographs of Hagood from the day of the arrest. Judge Engelmayer donned the fanny pack himself, with the seized firearm inside, to observe the purported bulge of the firearm. The district court also considered Hagood's pretrial affirmation recounting the search and arrest and heard testimony from Migliaccio, Rios, and Counihan.

---

[1] In 2009, Hagood had been convicted of felony possession of a controlled substance in the third degree under N.Y. Penal Law § 220.16.

[2] Counihan testified that he tried to activate his body camera before the arrest, but it did not record due to a camera malfunction. He had reported issues with his camera before the night of the arrest and was told to reset his camera. That failed to resolve the issue, so he was issued a new body camera about two weeks after the arrest.

6

Migliaccio, Rios, and Counihan described their professional experience, their observations of Hagood, and the events leading up to the arrest. In addition, all three testified that they had prior experience involving firearms in fanny packs. Migliaccio had "received intel from the NYPD intel bureau that guns are being kept in fanny packs" and heard about "[d]ozens" of firearms that other officers in his precinct had recovered from fanny packs. *Id.* at A189, A196. Hagood's fanny pack "looked similar" to those Migliaccio had seen in ten to twenty prior incidents involving firearms retrieved from fanny packs. *Id.* at A79.[3] Rios also knew about "a lot of recent arrests involving firearms that were in individuals' fanny packs strapped across their chests." *Id.* at A309-10. That year, Rios had responded to around ten incidents in which a defendant was carrying a firearm in a fanny pack. Similarly, Counihan had responded to around eight to ten such incidents that year.

Migliaccio also testified that he later learned that Hagood's fanny pack contained objects other than the gun, including two packs of cigarettes. Nevertheless, Migliaccio said that he knew he had observed the firearm and not the other objects because "[t]he firearm is bigger than both cigarette packages" and "doesn't look like cigarette packages." *Id.* at A95. Also, "the fanny pack was tight against [Hagood's] chest," compressing the other objects and making the metal firearm "more pronounced." *Id.* Migliaccio testified that

---

[3] The record is unclear as to how many of these incidents were in the context of a *Terry* stop. Migliaccio initially indicated he had never recovered a firearm from a fanny pack during a *Terry* stop. But he later said that he misspoke, thinking he was being asked about *Terry* stops on the night of Hagood's arrest, and he clarified that he had, in fact, previously made *Terry* stops in which firearms were found in fanny packs.

7

the firearm recovered from Hagood was "a black Hi-Point semiautomatic firearm," which is "relatively large," "very heavy," and "known for having exaggerated features" including "the slide and the handle." *Id.* at A93. The firearm was also "loaded at that time," making it "even heavier." *Id.* at A96.

## C.     District Court Decision

After the suppression hearing, the district court issued a thorough opinion concluding that there was reasonable suspicion to stop and frisk Hagood. The district court determined that Hagood was seized when the officers approached him because "he was boxed in on all sides" so a "reasonable person in Hagood's circumstances would not realistically have regarded himself as free to leave." *Id.* at A507. [4] The district court further concluded that the officers reasonably suspected that Hagood was engaged in illegal activity, namely, unlawful possession of a firearm.

The district court primarily based this conclusion on Migliaccio's observations about Hagood's fanny pack. Specifically, the district court credited Migliaccio's testimony that he was able to see the outline of an object that "he believed was consistent with 'the top slide of a handgun,'" particularly because the fanny pack was strapped tightly across Hagood's chest. *Id.* at A513 (quoting *id.* at A79). Although Rios had testified that he and Migliaccio had 15 to 30 seconds to view Hagood, the district court concluded based on surveillance video that the officers would have seen Hagood for no more than two to three seconds. Nevertheless, the district court

---

[4] The government had argued that Hagood was not seized until Counihan restrained him, but it does not appeal the district court's holding on that issue.

8

concluded that, "[f]or experienced officers focused on Hagood, . . . a few seconds while driving at a low rate of speed" would be "sufficient to observe a stationary and well-illuminated person wearing a weighted bag across his chest and acting in the manner described." *Id.* at A496. Moreover, "the area was sparsely populated at the time," and Migliaccio had prior experience recovering firearms from fanny packs. *Id.* In addition, Migliaccio's testimony was consistent with the district court's own observations after donning the fanny pack that "a long horizontal outline consistent with the top slide of the pistol was easily—indeed, dramatically—visible." *Id.* at A513-14.

The district court noted three other "data points" that reinforced the officer's reasonable suspicion to stop Hagood. *Id.* at A514. First, Hagood wore his fanny pack in a way that was unusual at the time. Second, both Migliaccio and Rios thought Hagood reacted nervously when he recognized them as NYPD officers. Finally, based on their professional experience and intelligence briefings, Migliaccio and Rios were both well aware of the prevalence of criminal activity, violence, and firearms in the neighborhood. The district court further concluded that "the same facts that suppl[ied] reasonable suspicion that Hagood was committing a crime necessarily suppl[ied] reasonable suspicion to justify a frisk for a weapon." *Id.* at A518.[5]

---

[5] The district court also rejected Hagood's argument that "the handcuffing transformed the event from a *Terry* stop into a *de facto* arrest," which Hagood does not challenge on appeal. App'x at A520.

9

D.    Guilty Plea and Sentencing

On November 5, 2021, Hagood entered a conditional guilty plea to the single count in the indictment.   The plea agreement expressly reserved Hagood's right to appeal the district court's July 15, 2021 order denying his motion to suppress. [6]   Hagood was subsequently sentenced to 27 months' imprisonment, to be followed by three years of supervised release, and a $100 mandatory special assessment.

## II.   DISCUSSION

Hagood argues that the district court erred by denying his motion to suppress because the officers lacked reasonable suspicion to perform a *Terry* stop.   We disagree.   The arresting officers reasonably suspected that Hagood was armed based on their observations of Hagood's fanny pack, his nervous reaction to seeing them, and his presence in a high-crime area late at night.

A.    Legal Standards

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure."   U.S. Const. amend. IV. "Warrantless searches and seizures are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.   The *Terry* investigative stop and frisk is one such exception."   *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (en banc) (cleaned up).   In *Terry v. Ohio*, 392 U.S. 1

---

[6] On December 21, 2021, the district court held a conference and reallocuted Hagood regarding his plea because Hagood had been under the influence of a controlled substance during the November 5 plea hearing.

10

(1968), and its progeny, the Supreme Court made clear that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). Similarly, a *Terry* frisk requires "reasonable suspicion not only that criminal activity is afoot, but also that the person suspected is 'armed and dangerous.'" *Weaver*, 9 F.4th at 139 (quoting *Terry*, 392 U.S. at 30).

"Reasonable suspicion is less than probable cause and must be established by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *United States v. Hawkins*, 37 F.4th 854, 857 (2d Cir. 2022) (cleaned up). "'Contextual considerations,' such as 'the fact that the stop occurred in a high crime area,' factor into a reasonable-suspicion analysis, and the officers' assessment of an individual's 'nervous' or 'evasive behavior' is 'pertinent' in establishing reasonable suspicion." *Id.* at 858 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)) (cleaned up). "Although any one of these factors, standing alone, might not support reasonable suspicion, we do not subject factors pertaining to an officer's reasonable suspicion to . . . a 'divide-and-conquer analysis.'" *United States v. Santillan*, 902 F.3d 49, 58 (2d Cir. 2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). "We view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training." *Id.* at 56.

To deter Fourth Amendment violations, the Supreme Court created a "prudential doctrine" known as the exclusionary rule, *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal quotation marks

omitted), which "often requires trial courts to exclude unlawfully seized evidence in a criminal trial," *Utah v. Strieff*, 579 U.S. 232, 237 (2016). Under the exclusionary rule, a defendant may move to suppress evidence recovered from a *Terry* stop or search that was conducted without reasonable suspicion.[7]

"When considering a ruling on a motion to suppress evidence, we review a district court's legal conclusions *de novo*, its findings of fact for clear error, and its decisions on mixed questions of law and fact, including whether there was reasonable suspicion to justify a frisk, *de novo*." *Weaver*, 9 F.4th at 138.[8] In doing so, we give "due weight to inferences drawn from th[e] facts by resident judges and local law enforcement officers," *id.*, and "special deference to findings that are based on determinations of witness credibility," *Hawkins*, 37 F.4th at 857 (citation omitted).

---

[7] The dissent critiques the exclusionary rule on policy grounds, *see* Dissent at 11-14, but this argument is beside the point. Our duty is to "apply the applicable precedents regardless of the arguments against maintaining those precedents." *McKinney v. City of Middletown*, 49 F.4th 730, 746-47 (2d Cir. 2022). In any event, this is not a case involving "dubious justifications of police playing hunches that turn out right." Dissent at 11. The district court made a careful determination well supported by the evidence before it.

[8] The parties disagree about whether we not only review for clear error but also view the facts in the light most favorable to the government. *Compare United States v. Pabon*, 871 F.3d 164, 173 (2d Cir. 2017) ("[I]n reviewing the district court's decision, we apply familiar standards governing clear error review, without viewing the evidence in either party's favor."), *with United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) ("In reviewing the denial of a defendant's motion to suppress, we view the record in the light most favorable to the government."). We do not decide that issue because we would affirm the denial of Hagood's motion to suppress under either standard.

B.    Analysis

The district court correctly concluded that the officers had reasonable suspicion to perform a *Terry* stop based on Officer Migliaccio's observations of Hagood's fanny pack, Hagood's nervous reaction to seeing the officers, and his presence in a high-crime area late at night.

The most compelling evidence of reasonable suspicion was Migliaccio's observations.    It is well established that a bulge consistent with the shape of a firearm, and located somewhere a firearm would likely be found, supports reasonable suspicion.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (observing that a "bulge in [a] jacket permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer," so the "pat-down" was constitutional); *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (observing a defendant "reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline" supported reasonable suspicion to perform a *Terry* stop).[9]   Here, Migliaccio testified that the fanny pack "appeared heavy, like there was a

---

[9] *See also United States v. Manuel*, 64 F. App'x 823, 826–27 (2d Cir. 2003) ("[W]e find that Officer Costantino's frisk was justified, because the bulge in Defendant-Appellant's waist area permitted him to conclude that Defendant-Appellant was armed and posed a danger to the officers."); *United States v. Lucas*, 68 F. App'x 265, 267 (2d Cir. 2003) ("The officer's personal observation of an object that appeared to be a gun created adequate 'reasonable suspicion' to believe that appellant was unlawfully possessing a firearm, and justified conducting a limited weapons search to protect the safety of officers and others."); *United States v. Watson*, No. 20-CR-346, 2021 WL 535807, at *7 (S.D.N.Y. Feb. 11, 2021) (finding "reasonable suspicion to frisk" a defendant when "the bulge that the officers observed in [the defendant's] fanny pack was not a generic bulge, but a 'heavy-looking L-shaped object'" (citations omitted)).

weighted object inside of it" and contained "an elongated, rigid, solid object" that "appeared . . . to be potentially the top slide of a handgun." App'x at A79. Migliaccio also knew that firearms were increasingly concealed in fanny packs based on his "experience and specialized training," *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006), including (1) briefing from the NYPD intelligence bureau about guns being kept in fanny packs, (2) knowledge that other officers in his precinct had recovered dozens of firearms from fanny packs, and (3) personal experience recovering firearms from fanny packs in approximately ten to twenty other incidents. [10] So Migliaccio's observations of a bulge consistent with the shape and placement of a firearm support a finding of reasonable suspicion that Hagood was engaged in criminal activity—namely, unlawful possession of a firearm.

Migliaccio's testimony about his observations and experience was also consistent with other evidence introduced at the hearing. First, Rios corroborated Migliaccio's observations by testifying that he also observed a heavy bulge in Hagood's fanny pack from the same vantage point as Migliaccio. Second, Migliaccio's observations were consistent with the district court's own finding that "a long horizontal

---

[10] Hagood argues that Migliaccio's experience "adds no reasonable ground to suspect fanny packs of carrying guns" because Migliaccio's testimony did not make clear whether his prior experience with fanny packs involved "fanny packs [that] were being worn or just lying in the car." Appellant's Br. at 47. The dissent similarly states that Migliaccio's testimony "tells us nothing about his experience in situations like the one he faced in this case." Dissent at 8. We disagree. Regardless of the specific context of each case, Migliaccio's experience informed his suspicions because he knew fanny packs were increasingly used to hide firearms and Hagood's fanny pack "looked similar" to fanny packs containing firearms that he had observed previously, whether worn on a suspect's person or lying in a vehicle. App'x at A79.

outline consistent with the top slide of the pistol" was "dramatically" visible when the fanny pack was worn in the manner Migliaccio described. App'x at A513-14.[11] Finally, Rios and Counihan testified that, in 2020, they also had recovered firearms from fanny packs in a number of incidents. So we discern no clear error in the district court's conclusion that Migliaccio was credible.

Furthermore, the district court identified three other factors that bolster a finding of reasonable suspicion. First, "Hagood was wearing the fanny pack in an unusual manner" suggesting that "the contents of the pack might also be unusual (or unusually heavy)." App'x at A514-15. Migliaccio testified that Hagood wore his fanny pack "in a manner that was not consistent with everyday wear" and that would allow Hagood to access its contents more easily. *Id*. at A77. As Hagood puts it, "Migliaccio was not the fashion police." Appellant's Br. at 48. But Migliaccio could permissibly consider that Hagood wore an accessory associated with firearm concealment in such a way as to make a firearm easily accessible.

Second, according to Migliaccio, Hagood "looked really nervous" and "visibly agitated" when he saw the officers and "almost jumped." App'x at A80, A185. Rios similarly testified that Hagood "had a nervous look" after seeing them. *Id*. at A310. Although the dissent claims that a "nervous reaction is not an unusual reaction to

---

[11] The dissent derides the district court's effort as a "woefully inadequate" "sham 'experiment'" because it did not account for the other contents of the fanny pack, the distance, the lighting, and other viewing conditions. Dissent at 7. The point of the exercise, however, was not to replicate the scene, but to test the credibility of Migliaccio's testimony by determining whether the shape of the slide of the pistol could even be discernable through a tightly strapped fanny pack. In its own test, the district court concluded that the slide was in fact visible— "dramatically" so. App'x at A514.

15

police presence," Dissent at 9, the Supreme Court has made clear that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124; *see also Weaver*, 9 F.4th at 147–48 (finding that defendant engaged in "[u]nusual, evasive, or furtive behavior" when he "hitched his pants before entering [a] gray sedan" because that conduct was consistent with "hiding something from the police"); *Hawkins*, 37 F.4th at 858 (finding reasonable suspicion based, in part, on the officers' observations "that both defendants exhibited body movements they perceived to be evasive").

Third, the context further supported the district court's finding of reasonable suspicion. Hagood stood outside, late at night, in a high-crime neighborhood. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. To the contrary, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.*; *accord Padilla*, 548 F.3d at 188. The district court thus properly noted that "the suspect's behavior, the context of the stop, and the crime rate in the area" reinforced its finding of reasonable suspicion. *Weaver*, 9 F.4th at 140.

Hagood argues that the officers did not have reasonable suspicion to conduct a stop. First, Hagood argues that Migliaccio's testimony should not have been credited because Migliaccio (unlike the district court) observed the fanny pack at night, from 30 feet away, and for only two to three seconds. But the district court acknowledged these facts and considered the video of Migliaccio and Rios driving by, which Hagood describes as "prov[ing] the actual

16

time frame, conditions, and obstacles" present just moments before the arrest.    Reply Br. at 10.    The district court also recognized that it did not don the fanny pack under "laboratory conditions."    App'x at A442-43.    Having fairly considered both evidence supporting and undermining Migliaccio's observations, the district court reasonably concluded that for "experienced officers focused on Hagood, . . . a few seconds while driving at a low rate of speed were sufficient to observe a stationary and well-illuminated person wearing a weighted bag across his chest."    *Id.* at A496.    Although Hagood disagrees with this conclusion, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."    *United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008) (cleaned up).    "When, as here, credibility determinations are at issue, we give particularly strong deference to a district court finding."    *Id.* The district court thus did not clearly err by crediting the corroborated testimony of an experienced police officer.[12]

Second, Hagood argues that a generic line visible through the fanny pack could have been consistent with items other than a firearm, such as a phone, wallet, or eyeglass case.    But a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."    *Arvizu*, 534 U.S. at 277.

---

[12] The dissent nonetheless challenges the officer's credibility based on several observations supporting its own view that the officer had a "hunch" that "turned out to be right."    Dissent at 1; *see id*. at 3 n.1 (questioning the absence of body camera footage); *id*. at 4 (calling it "more than dubious" that Migliaccio "saw *any sort of outline* in the fanny pack resembling a gun"); *id*. at 5 (speculating about the amount of room in the fanny pack "for the gun to shift position"); *id*. at 9 n.4 (doubting that "Hagood could see Rios's uniform").    Not only is the dissent's reimagination of what happened based largely on speculation, but it flagrantly disregards the deference due to the district court's credibility determinations and findings of fact.

17

"Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991); *see also Weaver*, 9 F.4th at 149 ("A police officer, placed into an uncertain and developing situation, is not tasked with sorting through multiple possible scenarios and conducting a frisk for weapons only if that is the sole, or even the most likely, possibility.").[13]

Finally, Hagood argues that the "other data points" cited by the district court could add "no increment" of reasonable suspicion. Appellant's Br. at 28, 48, 55. The dissent similarly proclaims that "[z]ero plus zero plus zero still equals zero. And one plus one plus zero does not equal five!" Dissent at 10. But this "erroneous 'divide-and-conquer analysis'" misunderstands the totality-of-the-circumstances approach. *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) (quoting *Arvizu*, 534 U.S. at 274); *Santillan*, 902 F.3d at 58. In fact, it is the opposite. Under the totality of the circumstances, something unremarkable on its own may become significant in conjunction with other factors. The district court thus correctly concluded that Hagood's unusual way of wearing the fanny pack, his nervous demeanor, and the time and location of the encounter "reinforced" its finding of reasonable suspicion, even

---

[13] The dissent relies on a photo of the opened fanny pack, which showed the gun positioned with its slide down across the bottom of the bag. *See* Dissent at 4-5. But there is no reason to assume that the photo depicting the contents of the fanny pack reflected the arrangement of the items inside when worn by Hagood. The photo was taken after a "scrum" that involved Hagood and the officers making enough physical contact that two officers were able to detect the firearm. App'x at A499.

though such observations "would fall well short of establishing reasonable suspicion" if made "in isolation." App'x at A514, A516.

## III. CONCLUSION

For the foregoing reasons, we conclude that the district court correctly denied Hagood's motion to suppress. The judgment of the district court is thus affirmed.

GUIDO CALABRESI, *Circuit Judge*, dissenting:

The ordinary, reasonable person looking at this case would describe it as follows: Officer Migliaccio drove by Michael Hagood late one night from thirty feet away and had a two- or three-second window during which to observe Hagood. Migliaccio saw Hagood standing outside, calmly talking to two friends and wearing a fanny pack over his shoulder and across his chest. For whatever reason, Migliaccio had a hunch that Hagood was up to no good. Migliaccio acted on his hunch and decided to find a way to search Hagood. His hunch turned out to be right. Hagood was, indeed, a past felon improperly in possession of a gun.

Migliaccio later justified his decision to search Hagood primarily by stating that he could see the outline of a hard object across the top of Hagood's fanny pack. The outline, Migliaccio said, resembled the slide of a gun. Additionally, according to Migliaccio, Hagood looked nervous when he drove by.

The majority makes a remarkable effort to show that under all the circumstances, the officers had good reason to believe that Hagood was committing a crime. The majority affirms the district court's holding that a totality of circumstances—Hagood was in a high-crime area, he looked nervous when police passed by, he wore his fanny pack in an unusual manner, and one officer, Migliaccio, claimed he could see a hard outline of an object inside the fanny pack—amounted to reasonable suspicion sufficient to allow a *Terry* stop. But, despite the majority's Herculean efforts, the record, at best, merely supports that Migliaccio had a hunch that turned out right.

For that reason, I respectfully dissent.

1

I.

Let us look at the facts in detail, which do not demonstrate anything, I believe, more than that the police briefly saw Hagood wearing a fanny pack, which might have contained a gun, but just as likely anything else, and was wearing it in an unusual, but not especially significant, way.

At the time of the seizure, Hagood was standing on the street outside a New York City Housing Authority building, between a row of parked cars and a double-parked SUV in the early morning hours of a fall evening.  Hagood was talking to two other men, one of whom sat on the passenger's side of the SUV, and one of whom stood leaning against the SUV.  Hagood wore a fanny pack slung across his chest and over his shoulder.  The fanny pack was zipped closed.

Two officers, Migliaccio and Rios, drove by and had two or three seconds in which to observe Hagood from thirty feet away.  Hagood was five-foot-eight-inches tall and Migliaccio could not see him above or through the double-parked SUV.  Another double-parked car a few cars' lengths behind the SUV also blocked the officers' view of Hagood as they drove past him.  Thus, Migliaccio could see Hagood only for the two- or three-second window in which Migliaccio's vehicle had passed the double-parked SUV but had not yet reached the second double-parked car.

Despite the darkness, distance, and that he was driving, Migliaccio testified that he had a "direct" view of Hagood, aided by his headlights and fluorescent lights from storefronts across the street.  A74.  Migliaccio stated that it "appeared to [him]" that Hagood and the men were merely "having some kind of interaction,

a conversation or maybe hanging out." A 73. No crime had been reported in the area that evening.

Still, Migliaccio unilaterally decided to conduct a *Terry* stop. He subsequently claimed he had seen a "rigid bulge" or an "elongated," "hard" "line" in Hagood's fanny pack, which he thought might be consistent with the shape of a gun. A79, 106. [1]

Migliaccio himself testified that he was not sure whether the "line" he saw in the fanny pack indicated that Hagood had a gun, cell phone, wallet, or otherwise. A79, A155–56. Migliaccio's testimony was that he saw some "portion" of a rectangle which had some "weight" to it. A155. An officer's description that he saw a "weighty object" on the defendant's person may sometimes support a showing of reasonable suspicion. *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008). But our precedent cannot sensibly be read to mean that such support follows from the bare fact that an individual has some sort of bag and that that bag appears to contain a hard object that is the size of a gun. This is especially true given that common objects, especially the "ubiquitous" cell phone, are similar in size to a handgun. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 635 (S.D.N.Y. 2013); *cf. Padilla*, 548 at 189 (explaining that because the defendant used a

---

[1] It is difficult to verify Defendants–Appellees' account of what they saw when they passed by Hagood and later approached him, given that very little body camera footage exists before the officers stopped and handcuffed Hagood. Some of the officers made excuses as to why their body cameras did not capture the stop, ranging from technical difficulties to claiming that there was no time to push the power button before approaching Hagood. None of the footage of the officers approaching Hagood contain any images of Hagood wearing the fanny pack before the police handcuffed him.

"distinctive gripping motion" when "adjusting" the object, the defendant's argument that the object could have been the "innocuous" cell phone failed).

Additionally, finding that Migliaccio, in fact, saw *any sort of outline* in the fanny pack resembling a gun, as the majority does, is more than dubious. Not only did Migliaccio view Hagood for just a couple of seconds, at night, from thirty feet away while he was driving, but he also testified that "a quarter to a third" of the fanny pack was tucked under Hagood's armpit. A 77–78. Such positioning would have obstructed Migliaccio's view of the length of the line he claimed he saw protruding inside the fanny pack—a key factor in determining whether the outline could resemble that of a handgun.

Moreover, a subsequent photo depicts Hagood's fanny pack zipped open, displaying its contents. The photo shows the gun positioned with its slide down across the *bottom* of the bag, with its handle pointing upwards. That positioning is the exact opposite of the line of the gun's slide across the top of the fanny pack that Migliaccio claimed he saw as he drove by.

Migliaccio had testified that the outline of the slide he allegedly observed was "evenly across the *top*" of the fanny pack, "between the zipper and the yellow top of the nameplate" on the front of the fanny pack. A155 (emphasis added); *see also* A39 (photo of fanny pack).[2] But the photo quite clearly shows the slide of the gun along the bottom of the fanny pack.

---

[2] Despite the majority's assertion, Majority Op. at 14, testimony by the other officers does not support Migliaccio's observation that a gun-like shape was visible through the fanny pack. Rios's testimony that, from the vehicle, he saw there was a "bulge" in the fanny pack and that it appeared "heavy" and "full" is too general to provide corroborative support to Migliaccio's

Migliaccio attempted to account for this inconsistency by stating that the fanny pack's contents might have been jostled between the time he spotted Hagood on the side of the street and when the officers handcuffed Hagood. And this, he said, could have caused the gun to change position inside the fanny pack. But Migliaccio also testified that he had been able to see the outline of the gun pressed against the fanny pack in the first place precisely because it was tight to Hagood's body. And this certainly suggests that it would have been difficult for the contents of the fanny pack to shift so drastically. If the fanny pack was so loose that there was room for the gun to shift position following the officers' brief interaction with Hagood, then Migliaccio's statement about tightness becomes more than doubtful.

Additionally, the photo of the open fanny pack shows that the gun was positioned between the two packs of cigarettes, with one pack of cigarettes wedged between the gun and the outer fabric of the fanny pack, which would have further obscured the outline shape Migliaccio claimed to have seen.

Still, in order to hold that he had reasonable suspicion to seize Hagood, the district court and majority opinion needed to find a way to credit Migliaccio's observation. They did so in several ways, all of them highly questionable.

---

testimony. A309, A370–71; *Padilla*, 548 F.3d at 189 (holding an officer's testimony that he saw a weighty object could give rise to reasonable suspicion because *he also included the size, shape, and heft of the bulge*; that the bulge could not appear to be any object other than a gun; and that the defendant gripped and adjusted the object as if it were a firearm). And, Counihan did not observe that anything significant was inside Hagood's fanny pack. Notably, both Rios and Counihan were closer to Hagood than Migliaccio.

First, the district court and the majority found that Hagood wore the fanny pack in an "unusual" way, and that that supported reasonable suspicion to stop Hagood. A514–15; Majority Op. at 15.

But there is no indication that Migliaccio, the lone decisionmaker for making the *Terry* stop, believed that wearing a fanny pack over one's shoulder was, in fact, an indication that the wearer had a gun. While Migliaccio did testify, as the majority notes, Majority Op. at 15 (quoting A77), that Hagood donned the fanny pack in a manner that was "not consistent with everyday wear," he also testified that he had seen many men, women, and children wearing fanny packs over their shoulders instead of at their waists prior to his encounter with Hagood. A77, A148–50.[3]

The majority's assertion that "Migliaccio could permissibly consider that Hagood wore an accessory associated with firearm concealment in such a way as to make a firearm easily accessible" demonstrates its desperation to justify what was really a hunch. Majority Op. at 15. Migliaccio did testify that, because of the way Hagood wore the fanny pack, he "might be potentially concealing a firearm," but never explained why that was so—especially as compared to the traditional donning of a fanny pack at the waist. A79–80. At most, Migliaccio said that over-the-shoulder placement was more likely to contain a firearm because it would keep a gun steady where it could be accessed. A191. But courts have elsewhere

---

[3] As Hagood points out, the manner in which Hagood wore the fanny pack was not unusual in October 2020. *See* Emilia Petrarca, *New Yorkers Have Discovered a New Way to Wear Fanny Packs*, The Cut (Sept. 6, 2017), https://www.thecut.com/2017/09/fanny-pack-waist-bag-street-style-trend.html.

6

cast doubt on similar explanations. *See Dixon v. United States*, No. 20-CR-368, 2021 WL 1662492, at *16 (E.D.N.Y. Apr. 28, 2021) ("Unlike waistbands, which are a known place for individuals to carry weapons, no evidence was introduced suggesting that cross-body bags are typically used to carry weapons."). And surely wearing clothes in an unusual way, without much more, is an unlikely basis to justify a search.

To support its finding that Migliaccio had reason to believe Hagood had a gun, the district court relied on a sham "experiment" conducted by the district court. A408–09, A441–46. The district court went through the motions of attempting to observe for itself whether Migliaccio truly could have seen the outline of a gun through Hagood's fanny pack, but it failed to recreate the key aspects of the scene. The district court judge had the prosecution put the gun inside the fanny pack, but the two cigarette packs and the package of cough drops were *not* added to the fanny pack. The district court judge then placed the fanny pack over his own shoulder. That means that he observed the fanny pack from just inches away—not from thirty feet away, as Migliaccio had. Additionally, unlike Migliaccio, the district court judge was at a standstill when he observed the fanny pack, not driving by for a two-second period of time. Nothing in the record indicates that the district court judge dimmed the lights, even though the *Terry* stop took place late at night with only headlights and the lights from the surrounding buildings illuminating the scene.

Though the district court judge admitted that the experiment did not replicate "laboratory conditions," A442–43, he still relied on this woefully inadequate exercise to support his opinion denying Hagood's motion to suppress

the gun, A513–14.  *See also* A443 (stating that the experiment was "closer to laboratory conditions" once the gun was placed inside the fanny pack before the district court judge donned it).  Oddly, the majority held that because the district court recognized that it did not review the fanny pack under "laboratory conditions," it did not unfairly weigh its "experiment" in finding Migliaccio credible.  Majority Op. at 17 (citing A442–43).  Perhaps not, but then what was the basis for finding Migliaccio's account to be credible?

The district court also relied on an assessment of Migliaccio's experience retrieving guns from worn fanny packs, stating that was why his two- or three-second observation carried so much more weight than it otherwise would have.  A495–96, A512–13, A515–16.  Of course, officers are permitted to make inferences that might elude an untrained person based on their experiences and specialized training.  *United States v. Freeman*, 735 F.3d 92, 95–96, 103 (2d Cir. 2013).  And a court must credit a reasonable officer's "commonsense judgments and inferences about human behavior."  *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (internal quotation marks and citation omitted).

But this reliance was not justified in the case before us.  In fact, the extent of Migliaccio's testimony was that he had conducted "somewhere around" five *Terry* stops of people wearing fanny packs in his career and had never retrieved a gun during those stops.  A192–93.  He had made ten to fifteen stops in which he recovered contraband from fanny packs inside a person's car.  A193–94.  And that tells us nothing about his experience in situations like the one he faced in this case.

Finally, the district court and the majority, to justify their stop, mention the fact that Hagood was in a high-crime area and appeared nervous.  But if this were

enough, any hunch in a particular neighborhood would be enough to justify a stop—and it isn't.

"Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990). And "generic actions," like conversing or hanging out with friends, that take place "in a high crime area[,] are not per se suspicious activities." *United States v. Bell*, 733 F. App'x 20, 22 (2d Cir. 2018); *see also United States v. Hussain*, 835 F.3d 307, 315 (2d. Cir. 2016).

Nor can a look of nervousness justify the stop—assuming *arguendo* that Hagood even knew that the unmarked vehicle contained police officers as it drove by.[4] A nervous reaction is not an unusual reaction to police presence. And district courts in this Circuit have specifically rejected the notion that a "deer-in-the-headlights" look may provide an objective indication of criminal activity afoot. *See Ellsworth v. Wachtel*, No. 1:11–CV–0381, 2013 WL 140342, at *6 n.5 (E.D.N.Y. Jan. 11, 2013); *United States v. Harris*, No. 1:11–cr–00143, 2012 WL 3192642, at *7 (D. Vt. Aug. 1, 2012). We ourselves have held, in a case not involving nervousness

---

[4] There is certainly a question of whether Hagood knew Migliaccio and Rios were police officers as their car drove past him. Probably, Hagood—in the dark, about thirty feet away, and behind a double-parked SUV he likely could not see through or over—did not realize that the unmarked vehicle Migliaccio drove was a police car during the two- or three-second window in which it would have been visible as it passed him. Under these circumstances, I am not at all certain that a reasonable officer could have believed that Hagood could see Rios's uniform in these conditions, which is what Defendants–Appellants rely on to bolster their argument that Hagood's nervousness supported their reasonable suspicion. *See Bell*, 733 F. App'x at 22 ("[W]hile [defendant] argues he did not see the word 'POLICE' on the detective's vest, the question is whether a reasonable officer believed [defendant] had seen" it.).

specifically, that "there is nothing suspicious about looking . . . at an approaching police car." *Dancy v. McGinley*, 843 F.3d 93, 110 (2d Cir. 2016).

***

The majority properly decries approaches that consider each individual piece of the government's evidence separately rather than looking at all the evidence together. Majority Op. at 18 (citing *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008)). But *Delossantos* merely required that courts ultimately engage in a totality-of-the-circumstances analysis, viewing the evidence as a whole before reaching a conclusion. 536 F.3d at 161. It did not require that noncredible pieces of evidence be given weight merely because of the presence of other similarly unpersuasive pieces of evidence. Zero plus zero plus zero still equals zero. And one plus one plus zero does not equal five!

In the end, I believe both the district court and the majority felt that the officers conducted the *Terry* stop due to a good and successful hunch. But, because a hunch is not legally sufficient, they each stretch the record to the point of absurdity in order to achieve "a totality of the circumstances" that would justify what, in fact, was an officer playing a hunch that turned out right.[5]

Because a hunch cannot amount to reasonable suspicion for a seizure, I respectfully dissent.

---

[5] The majority does not mention the fact that Hagood was a Black man nor that the neighborhood was, likely, a predominantly minority neighborhood. And so neither did I in my criticism. What I say would be correct regardless of the tremendous additional problems that our country's racial history adds. It is worth noting, though, that "[t]he majority of those stopped [by the NYPD] are people of color, and a vastly disproportionate number are Black." *See* New York Civil Liberties Union, *Stop-and-Frisk Data* (last visited Aug. 7, 2023), https://www.nyclu.org/en/stop-and-frisk-data.

## II.

Where are we now?  What the majority has done in this case is, sadly, not unusual.  And all too often courts of appeals find dubious justifications to be adequate in order to uphold the admission of evidence which was found on a hunch that turned out to be right.  *See, e.g., United States v. Fagan*, 71 F.4th 12 (1st Cir. 2023); *United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) (en banc).

This is due to the exclusionary rule, which, unless the search can be justified by the totality of the circumstances, leads to clear evidence of criminality being kept out and a guilty and potentially dangerous criminal being released.  As I have written elsewhere, the exclusionary rule, though seemingly needed to control police misbehavior, has been the primary source of acceptance of dubious justifications of police playing hunches that turn out right.  *See* Guido Calabresi, *The Exclusionary Rule*, 26 Harv. J.L. & Pub. Pol'y 111 (2003).

Moreover, hunches that turn out wrong are rarely challenged.  *See, e.g.*, Joanna C. Schwartz, *Civil Rights Without Representation*, 64 Wm. & Mary L. Rev. 641, 650 (2023) (illustrating, via interviews with civil rights attorneys, that they will "only accept cases with horrific facts [and] serious injuries" and will turn down cases where they "cannot prove substantial medical costs or other damages").  This is not surprising since the dubious doctrine of qualified immunity makes such suits very likely to fail.  *See, e.g., Penate v. Sullivan*, 73 F.4th 10, 18–20, 22 (1st Cir. 2023).

A bit of history may help us understand the absurdity of the current situation.  In the 1760s, a statute authorized "writs of assistance," which gave British customs officers the right to search any location for smuggled goods.  Akhil

11

Reed Amar, *The Words that Made Us* 12 (2021).  These officers did not need probable cause or even reasonable suspicion, and instead could search British citizens and colonists as they pleased.  *See id.*  If the search bore fruit, then the parties searched had no remedy.  *Id.* at 21.  The "rightness" of the hunch was its own justification.

According to Amar, the passage of these laws was one of the principal reasons for the American Revolution.  *Id.* at 8, 14–15.  But what the writs of assistance did was far less bad than the situation we now find ourselves in.  For, if the writ of assistance search came up short, "the innocent search victim could sue the searcher in trespass, and a civil judge and jury might well mulct the unsuccessful searcher with serious damages."  *Id.*; *see also Bruce v. Rawlins* (1770) 95 Eng. Rep. 934, 934–35; 3 Wilson K.B. 61 (holding, via jury, that an officer who acted pursuant to a writ of assistance but whose search of a home did not reveal any illegal goods owed damages to the homeowner).

At first glance, this model might appear attractive, anathema though it was to our Founders.  Unlike what happens under qualified immunity, the *bad* hunch under the writs of assistance was very costly to the searching officer and the government.  Ultimately, if, as some have estimated, more than ninety percent of today's hunches turn out wrong,[6] one might well think that the old English model would do a far better job of controlling police behavior than what we do today.  After all, knowing that he could be liable for trespass, "no sensible . . . officer would dare to search on a mere whim, thereby putting himself at risk of ruinous

---

[6] *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 584 (S.D.N.Y. 2013) (noting that between 2011 and 2012, "nearly 90% of the people stopped [by the NYPD] are released without the officer finding any basis for a summons or arrest").

liability." Amar, *The Words that Made Us* 12 (2021). And, as is most likely, if the government indemnified the officers, the government would have a very strong incentive to find ways of controlling bad officer hunches.

Let me be clear. I am not suggesting that we adopt such a rule. The rule creates a significant moral hazard: if officers behaving badly risked paying damages, they might be tempted to lie about their behavior. Officers who searched unsuccessfully might lie about finding evidence of a crime if their own liability was on the line. And that, since it would lead to innocent people being jailed, could be even worse than what happens now.

Still, our nation's beginnings do suggest that our current exclusionary-rule/qualified-immunity scheme is deeply wrong. Well into the nineteenth century, approaches closer to the English position were clearly stated. Thus, in *United States v. La Jeune Eugenie*, 26 F. Cas. 832, 843–44 (C.C.D. Mass. 1822) (No. 15,551), Chief Justice Story wrote that "using evidence does not depend, nor as far as I have any recollection, has ever been supposed to depend upon the lawfulness or unlawfulness of the mode[] by which it is obtained . . . even though it may have been obtained by a trespass upon the person, or by any other forcible and illegal means." And *Commonwealth v. Dana*, 43 Mass. (2 Met.) 329, 334–337 (1841) explained that an officer who exceeded his authority under a search warrant "would be responsible for the wrong done" but that it would be "no good reason for excluding the papers seized as evidence." I have elsewhere written criticizing the effect of the exclusionary rule on privacy and, there, as an academic, I offered a typically academic solution. Calabresi, *The Exclusionary Rule*, 26 Harv. J.L. & Pub. Pol'y 111 (2003). My role as a judge, however, is not to advocate for a particular

a solution.  Rather, it is to say that our current precedents—in which courts again and again tie themselves in knots to hold that the fruits of officers' hunches cannot be suppressed when they turn out to be right—does not work and that we have to do better.  *See Weaver*, 9 F.4th at 174 (Calabresi, J., dissenting).  I can only hope that sometime soon, after careful academic research, the legislative, judicial, and executive branches will come up with a way of controlling police behavior that is not as fruitless and offensive as what governs our law today!